IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JANE DOE and JOHN DOE, | § | CIVIL ACTION NO_____ |
| | § | |
| VS. | § | |
| | § | |
| HOLY SEE (VATICAN CITY STATE), | § | |
| THE ROMAN CATHOLIC CHURCH OF | § | |
| THE ARCHDIOCESE OF GALVESTON- | § | |
| HOUSTON, AND | § | |
| CARDINAL DANIEL N. DINARDO, HIS | § | |
| PREDECESSORS AND SUCCESSORS, AS | § | SECTION _____ |
| ARCHBISHOP OF THE ROMAN | § | |
| CATHOLIC CHURCH OF THE | § | |
| ARCHDIOCESE OF GALVESTON- | § | |
| HOUSTON | § | MAGISTRATE_____ |

## PLAINTIFFS' ORIGINAL COMPLAINT

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

COME NOW JANE DOE and JOHN DOE (collectively referred to as "Plaintiffs") and file this *Original Complaint* against Holy See (Vatican City State), The Roman Catholic Church of the Archdiocese of Galveston-Houston, and Cardinal Daniel N. DiNardo, his Predecessors and Successors, as Archbishop of The Roman Catholic Church of the Archdiocese of Galveston-Houston, (collectively referred to as "Defendants") for causes of action would show the following:

## I.  JURISDICTION AND VENUE

1.     This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1330 (a) because Defendant Holy See is a foreign state not entitled to immunity under 28 U.S.C. §§ 1604-1607.

2.     This Court has jurisdiction over Defendant Holy See under 28 U.S.C. § 1605(a) because Plaintiffs complain of both the private activities and conduct of Holy See in Texas and

throughout the U.S.A. and torts committed by Holy See, its officials and employees in Texas.

3.      Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. § 1391(a)(2) because all or a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the Southern District of Texas.

## II.  PARTIES

4.      Plaintiff JANE DOE is a lawful resident and citizen of the State of Texas.  She is an adult female who is using a pseudonym to protect her identity as a victim of childhood sexual abuse. Her identity is known to Defendants.  She was a child and a resident of Montgomery County, Texas at the time of the sexual molestation and sexual exploitation she suffered at the hands of Reverend Manuel Antonio La Rosa-Lopez.

5.      Plaintiff JOHN DOE is a lawful resident and citizen of the State of Washington.  He is an adult male who is using a pseudonym to protect his identity as a victim of childhood sexual abuse.  His identity is known to Defendants.  He was a child and a resident of Montgomery County, Texas at the time of the sexual molestation he suffered at the hands of Reverend Manuel Antonio La Rosa-Lopez.

6.      Defendant Holy See (Vatican City State) is the sovereign nation located in Rome, Italy and the ecclesiastical, governmental, and administrative capital of the Roman Catholic Church. Holy See may be served with process by and through its Secretary for Relations with States (Foreign Minister), Archbishop Paul Gallagher, Apostolic Palace 00120 Vatican City State.

7.      Defendant The Roman Catholic Church of the Archdiocese of Galveston-Houston ("Archdiocese of Galveston-Houston" or "Archdiocese") is a division of Defendant Holy See's

business and private enterprise that had previously been designated as The Roman Catholic Diocese of Galveston-Houston ("Diocese of Galveston-Houston" or "Diocese").  The Archdiocese is the center of control and oversight for the Holy See's ecclesiastical metropolitan territory of Galveston-Houston ("Galveston-Houston Metropolitan District") that includes the counties of Austin, Brazoria, Fort Bend, Galveston, Grimes, Harris, Montgomery, San Jacinto, Walker and Waller in the State of Texas.  The Archdiocese has control and oversight for all of the vicariates and deaneries and seminaries created by the Holy See within the Galveston-Houston Metropolitan District, including the St. Mary's Seminary in Houston, Texas.  The governing official of The Archdiocese of Galveston-Houston is its Archbishop who is duly appointed, authorized and employed by Defendant Holy See to govern and control both the Archdiocese and the Galveston-Houston Metropolitan District and all the vicariates and deaneries and seminaries created by the Holy See within the Galveston-Houston Metropolitan District, to include St. Mary's Seminary in Houston, Texas.  Based on information and belief, the Archdiocese of Galveston-Houston is a Texas corporation and can be served with process by and through its current Archbishop, Cardinal, Daniel N. DiNardo, at 1700 San Jacinto Street, Houston Texas 77002.

8.     Defendant Cardinal Daniel D. DiNardo is the current Archbishop of The Roman Catholic Church of the Archdiocese of Galveston-Houston (hereinafter "Cardinal DiNardo"). Cardinal DiNardo, his predecessors and successors, are duly appointed, employed and authorized by Defendant Holy See to oversee and control both a division (Archdiocese of Galveston-Houston) and an ecclesiastical metropolitan territory of vicariates and deaneries and seminaries (Galveston-Houston Metropolitan District), all within the Holy See's business and private enterprise.  Cardinal DiNardo is Defendant Holy See's governing official of the Archdiocese and the district vicariates

and deaneries and seminaries located within the Galveston-Houston Metropolitan District, to include Saint Mary's Seminary in Houston, Texas. Cardinal DiNardo is a resident and citizen of the State of Texas and can be served with process at 1700 San Jacinto Street, Houston Texas 77002.

### III.  FACTUAL BACKGROUND

9.      At all times material herein, Reverend Manuel Antonio La Rosa-Lopez was a Roman Catholic seminarian educated, trained and certified for a vocation in the priesthood by Defendant Holy See and The Roman Catholic Diocese of Galveston-Houston (later re-designated by Holy See as The Roman Catholic Church of the Archdiocese of Galveston-Houston) and under their direct supervision, authority and control, particularly on the issue of child sex abuse. At all times material herein, Reverend Manuel Antonio La Rosa-Lopez was and continues to be a priest and pastor, minister and counselor employed by the Diocese of Galveston-Houston and Defendant The Roman Catholic Church of the Archdiocese of Galveston-Houston, and under their direct supervision, authority and control, particularly on the issue of child sex abuse.

10.     Defendant Holy See is a sovereign nation and enters into treaties and conventions with other foreign states, including but not limited to the *Universal Declaration of Human Rights* and the *Convention on the Rights of the Child*. Holy See maintains diplomatic relations with other foreign states, including the United States, and has observer status in the United Nations. Defendant Holy See occupies its own sovereign territory located within the city of Rome, Italy.

11.     Defendant Holy See is a traditional monarchy where it holds all authority in the first instance and any authority held by others within the institution is delegated from the Holy See. The Holy See has reaffirmed this in its book of rules and regulations, the Code of Canon Law: "The Roman Pontiff ... has not only primacy of honor, but supreme and full power of jurisdiction over the

4

universal Church both in those things that pertain to faith and morals, and in those things that affect the discipline and government of the Church." (Canon 218 from the 1917 Code)

12.     Defendant Holy See is the composite of the authority, jurisdiction, and sovereignty vested in the Pope and his delegated advisors and/or agents to direct the activities and business of the world-wide Roman Catholic Church.  Defendant Holy See has unqualified power and control over the Catholic Church, including each and every individual and section of the Church, including but not limited to all clerics and priests, bishops, archbishops, and cardinals, and all other Church workers, as well as the ecclesiastical provinces, dioceses, and archdioceses and seminaries.

13.     Defendant Holy See directs, supervises, supports, promotes and engages in the oversight of the sovereign nation, the organization, and its employees for the purpose of the business, foreign affairs, and employees of the world-wide Roman Catholic Church, and provides religious and pastoral guidance, education and counseling to Roman Catholics world-wide in exchange for all or a portion of the revenues collected from its members.  The Holy See engages in these activities through its agents who work under the authority of the Holy See —namely the cardinals, archbishops, bishops, and clergy of the Roman Catholic Church.

14.     Defendant Holy See has complete and total control, including day-to-day control, over each aspect of the Catholic Church.  To the extent that some of the entities underneath the Holy See's absolute control are separate corporations or organizations —e.g., Defendant Archdiocese and it's charity organization, Defendant Holy See maintains complete and final control over these separate corporations and organizations.  The Holy See directs and requires each of these entities to strictly follow all of its policies and procedures, report its activities to the Holy See, and requires each cleric employed with the separate corporation or organizations to swear absolute obedience to

5

the Holy See.  Defendant Holy See is the only entity that can create or terminate these corporations and organizations and Holy See has day to day control of these entities through mandatory policies and procedures, mandatory meetings, and mandatory obedience.  Any corporations or organizations, including Defendant Archdiocese, were and are an alter ego of the Holy See.

15.     With respect to the issue of child sex abuse, the Holy See demands complete and unwavering obedience regarding procedures, the scope of potential penalties, and how each case will be disposed of ultimately.  Additionally, Defendant Holy See determined that it would require some of the entities under its control to incorporate in order to reduce the Holy See's exposure to claims by people who the Holy See has harmed and in order to keep the public from discovering the Holy See's involvement in the systematic cover-up and concealment of child sex abuse by its agents.

16.     Defendant Holy See's organizational structure and chain of command mandate that the Holy See and its head of state, the Pope, have a significantly high level of involvement in the routine and day-to-day activities of its agents, cardinals, archbishops, bishops, clergy and instrumentalities, particularly with respect to the handling of clergy who have engaged in certain specified conduct, including child sex abuse.  By virtue of his office, the Pope, as head of the Holy See, possesses supreme, full, immediate and universal ordinary power in the Catholic Church, which he is always able to exercise freely.  There is no appeal of a decision of the Pope as head of the Holy See.

17.     Defendant Holy See is solely responsible for creating new divisions of its business enterprises and private activities (called an "ecclesiastical province" or "diocese" or "archdiocese") around the world.  Only the Holy See has this power.  Defendant Holy See created all the ecclesiastical provinces and dioceses and archdioceses in Texas, including The Texas Province -

formed in 1839, The Diocese of Galveston -founded in 1847 to serve the State of Texas and re-designated in 1959 to Diocese of Galveston-Houston to serve Galveston and Houston and the surrounding areas, and The Archdiocese of Galveston-Houston -established in 2004.  Holy See creates, divides and re-aligns dioceses, archdioceses and ecclesiastical provinces.  Holy See is solely responsible for any modifications or elimination of the divisions and districts of its business enterprise.

18.     Defendant Holy See interacts with its local divisions and districts (its ecclesiastical provinces and dioceses and archdioceses) and employees in the United States and elsewhere in a manner that controls their day-to-day operations and provides for no discretion on numerous issues, and in particular the handling of child sex abuse by clergy and the determinations on whether clergy remain in the Roman Catholic ministry.  Defendant Holy See requires its duly appointed employees, including those cardinals and archbishops and bishops in the United States in charge of the local operations of the Roman Catholic ministry, to make "Ad Limina" visits to Rome and to write detailed "quinquennial reports" about the state of the Roman Catholic ministry, including but not limited to personnel issues, finances and real estate holdings.  Defendant Holy See further requires information on the source of the income of pastors and their supervisors, i.e., whether it is from real estate, public funds, an uncertified sum accruing through individual stole fees, or from a contribution made by the Catholic faithful or by the diocese.

19.     The Holy See routinely promulgates its policies through various means including encyclical, canon law, and Papal pronouncements.  Defendant Holy See promulgates and enforces the laws and regulations regarding the education, training and standards of conduct and discipline for the clergy who serve in the educational and pastoral workings of the world-wide Catholic

Church.  The "proper and exclusive right" to train those destined for the sacred ministries in the Catholic Church is affirmed in Holy See's Code of Canon Law.  (Canon 232 from the 1983 Code) The training of sacred ministers as a private activity of the Holy See was decreed by the Council of Trent (1563) to take place in seminaries that would be erected in all of the Holy See's local provinces, where the appointed governing official for the local territory could recommend "candidates for the priesthood".  In 1901, to serve the Texas Province, the Holy See founded St. Mary's Seminary in La Porte, Texas for the education of men to become priests of the Roman Catholic Church with the day-to-day operations delegated to the Diocese of Galveston, followed by the Diocese of Galveston-Houston and its successor entity, the Archdiocese of Galveston-Houston, and its duly appointed bishops and archbishops.  In 1932, to serve religious communities and dioceses around the world, Holy See founded Sacred Heart School of Theology in Hales Corners, Wisconsin; Holy See delegated the day-to-day operations of this seminary to the Sacred Heart Monastery and the Congregation of the Priests of the Sacred Heart.  With the passage of time, seminaries continue to be the object of the Holy See's concern where jurisdiction over the seminaries has been reserved and assigned to the institutional departments of the Holy See in order to provide a universal character for the establishment, governance, discipline, nomination of rectors, administration of property, and the studies of the seminaries.

20.    The Second Vatican Council (1962-1965) re-affirmed the critical importance of "priestly training" as a private activity of the Holy See and solemnly embraced the notion that "the destiny of the Church is closely bound" to its seminaries.  The "Decree on the Training of Priests" from the Second Council makes it clear that the Holy See is "fully aware that the desired renewal of the whole Church depends upon a priestly ministry."  Through it's norms and directives for

seminaries, the Holy See maintains direct involvement with the "formation of clerics" and the details of the complete training to be imparted to future ministers of the Roman Catholic Church. Defendant Holy See oversees and controls the admissions requirements and curricula to ensure that "candidates to the priesthood" are properly prepared to minister and serve the Catholic faithful.

21.     The Vatican sets all of the certification rules for becoming a priest.  These rules dictate who can administer the process, who can be made a priest, who is barred from the priesthood, how the ceremony is to be conducted when someone becomes a priest, and how to document the process.  Defendant Holy See directly and definitely controls the standards, morals, and obligations of the clergy of the Roman Catholic Church by and through its agents and instrumentalities, including the Congregation for the Clergy and the Congregation for Religious both delegated by the Pope and acting on his behalf and under his authority.  Holy See mandates the morals and standards of conduct of all clergy of the Roman Catholic Church by enforcement of the Code of Canon Law written and promulgated by Defendant Holy See and used as the employee manual for clergy.

22.     Once certified as a Roman Catholic clergyman, all clergy and priests agree and vow to show respect and obedience to Defendant Holy See, the Pope and their bishop and/or archbishop. A priest receives financial support throughout the full length of his life, and he may not be deprived of his pension or his clerical status unless the Holy See approves.

23.     The Holy See has complete and final control over each bishop, archbishop, cardinal, priest and cleric within the Catholic Church.  Holy See has the final and sole power to remove individual clergy and no priest, bishop, archbishop, cardinal or cleric may be removed from service or position of leadership without the approval of Defendant Holy See; nor can any priest, bishop, archbishop, cardinal or cleric remain in service or a position of leadership over the objection of

Defendant Holy See.  By issuing instructions, mandates and dictates in the United States, Defendant

Holy See is also directly and solely responsible for removing bishops, archbishops and cardinals

from service and/or making them ineligible for positions of leadership in the various local divisions

and offices of the Roman Catholic Church.

24.     Defendant Holy See creates, appoints, assigns, reassigns and retires all clerics in the

order of bishop.  Holy See exercises the power to directly assign and remove individual priests and

deacons through the archbishops and bishops that the Holy See appoints to govern and control the

archdioceses and dioceses, respectfully.  Defendant Holy See also examines and is responsible for

the work and discipline and all things which concern archbishops, bishops, priests and clerics.  In

furtherance of this duty, Defendant Holy See requires archbishops and bishops to file a report, on

a regular basis, outlining the status of and any problems with clergy.

25.     In 1962, the Holy See issued "Instruction on the Manner of Proceeding in Cases of

Solicitation" ("1962 Instructions") to all archbishops, bishops, and other diocesan ordinaries, which

contains mandatory and specific instructions on the handling of child sex abuse by clergy "ordering

upon those to whom it pertains to keep and observe it in the minutest detail".  Moreover, at all times

material herein, the Defendant Holy See mandated the highest level of secrecy for all those involved

in handling allegations of sexual abuse, to include its agents duly appointed as archbishops to govern

and control the Galveston-Houston Metropolitan District and the Archdiocese, Joseph Fiorenza (duly

appointed from 2004- 2006) and Cardinal Daniel DiNardo (duly appointed from 2006- present) and

its agents duly appointed as bishops of the Diocese of Galveston-Houston, Wendelin Nold (duly

appointed from 1950- 1975), John Morkovsky (duly appointed from 1975- 1985), Joseph Fiorenza

(duly appointed from 1985- 2004).  The policies of the Holy See expressed in the 1962 Instructions

and in other documents require bishops and archbishops in the United States to, among other things, refuse to report childhood sexual abuse committed by Catholic priests to criminal or civil authorities, even where such failure to report would itself be a criminal offense.

26.     Upon information and belief, in 1992, the Diocese of Galveston-Houston by and through its duly appointed Bishop Fiorenza recruited and admitted Manuel Antonio La Rosa-Lopez ("La Rosa-Lopez") to St. Mary's Seminary where the Diocese and Bishop Fiorenza sponsored and supervised and controlled La Rosa-Lopez's education and training as a seminarian and "candidate to the priesthood," all according to Defendant Holy See's norms and requirements for "priestly training" of Roman Catholic Priests.  From approximately 1992 to 1994, the Diocese of Galveston-Houston employed and assigned La Rosa-Lopez, as a "candidate to the priesthood" and cleric, to serve as a part-time minister and counselor at St. Thomas Moore Church ("St. Thomas"), a parish in Houston, Texas within the Diocese of Galveston-Houston.  During this period of time, La Rosa-Lopez also lived in the rectory of St. Thomas where he quickly ingratiated himself with the children of Spanish-speaking parishioners, including a sixth-grade boy, whom he sexually abused.  Very soon after the abuse, the boy told family members, who then informed the pastor of St. Thomas, Father William Young.  In October of 1992, Bishop Fiorenza, as well as diocesan lawyers, were notified about the abuse, but they did not report La Rosa-Lopez to law enforcement.  Neither the parishioners at St. Thomas nor the public were told or warned about La Rosa-Lopez's sexual proclivities and conduct.  Instead, the Diocese kept this information secret and Bishop Fiorenza ordered La Rosa-Lopez to undergo "spiritual and psychological evaluations."  By the spring of 1993, La-Rosa-Lopez was returned to St. Mary's Seminary again under the Diocese's sponsorship and supervision and

control but did not complete his studies at St. Mary's Seminary.  In 1994, La Rosa-Lopez was abruptly transferred to Sacred Heart School of Theology in Hales Corners, Wisconsin.

27.     Plaintiff alleges that between 1992 and 1994 while La Rosa-Lopez was a seminarian and "candidate to the priesthood" at St. Mary's Seminary and a holy cleric assigned to St. Thomas Moore Church, La Rosa-Lopez molested and sexually abused and exploited Catholic parishioners and others, specifically male children, in connection with his work and service as a part-time minister and counselor in the parish where the Diocese of Galveston-Houston employed and assigned La Rosa-Lopez to carry out the Holy See's mission and the activities in the Roman Catholic Church.

28.     In 1996, Defendant Holy See, by and through the Diocese of Galveston-Houston and its duly appointed Bishop Fiorenza, approved La Rosa-Lopez's "priestly training" from St. Mary's Seminary and Sacred Heart School of Theology.  In May 1996, the Holy See authorized the Diocese of Galveston-Houston and Bishop Fiorenza to certify La Rosa-Lopez for the ministry as a Roman Catholic Priest.  Despite the risk Bishop Fiorenza knew La Rosa-Lopez absolutely represented to children, Bishop Fiorenza conducted La Rosa-Lopez's ordination where La Rosa-Lopez agreed to be obedient to his Bishop and the Holy See (the Pope).

29.     Qualified and cloaked with the Holy See's certification for the Roman Catholic ministry and ordination by and through the Diocese of Galveston-Houston and its duly appointed Bishop Fiorenza, the Diocese of Galveston-Houston and Defendant Archdiocese accepted, employed and assigned Father La Rosa-Lopez as a Roman Catholic Priest, pastor, minister and counsel entrusted with the care of souls.  From 1996 to 2001 Father La Rosa-Lopez was employed as a Diocesan Priest and Assistant Pastor at Sacred Heart, in Conroe, Texas, a parish in the Archdiocese

of Galveston-Houston.   In 2001, the Diocese reported La Rosa-Lopez's assignment status as "removed from ministry."   Based upon information and belief, La Rosa-Lopez was sent to the Shalom Center in Splendora, Texas for "psychological evaluation and treatment" from April 16, 2001 to January 3, 2002.   Between 2002-2004, the Diocese listed La Rosa-Lopez as being on "Leave of Absence."   In 2004, La Rosa-Lopez was promoted by the Diocese and assigned as pastor of St. John Fisher Church ("St. John") in Richmond, Fort Bend County, Texas.   In 2010, Defendant Cardinal DiNardo elevated La Rosa-Lopez to Archdiocesan Vicar for Hispanic Ministries, a position La Rosa-Lopez held until his arrest in September 2018.

30.     Plaintiffs allege that between 1999 and 2001, La Rosa-Lopez engaged in inappropriate sexual activities with children as a Diocesan Priest with the Diocese of Galveston-Houston and molested and sexually abused and exploited Catholic children at Sacred Heart, just as other Catholic children had been molested and sexually abused and exploited by La Rosa-Lopez between 1992 and 1994 while the Diocese of Galveston-Houston and its duly appointed Bishop supervised and controlled La Rosa-Lopez's education and training as a seminarian and "candidate to the priesthood" for the Roman Catholic Church at St. Mary's Seminary.   During the time-frame of the sexual abuse alleged herein, La Rosa-Lopez's employment and assignment with the Diocese of Galveston-Houston was as an official Catholic Priest in charge of educating and training young parishioners (children) in the Catholic doctrines and traditions and the required rites of passage for becoming a legitimate member of the Roman Catholic Church.   La Rosa-Lopez was therefore a duly recognized vice-principal, employee, agent, apparent agent, and/or an ostensible agent of the Diocese when he sexually molested, exploited and raped JANE DOE and JOHN DOE and other children in

13

the Galveston-Houston Metropolitan District, including the Diocese and Archdiocese of Galveston Houston.

31.     JANE DOE and JOHN DOE were raised in families of devout Roman Catholics. JOHN DOE's parents were founding members of Sacred Heart parish.  Plaintiffs' families devoted thousands of volunteer hours and contributed regular tithings to the Catholic Church, which contributions funded numerous Catholic activities including charitable activities of The Diocese of Galveston-Houston and later the Archdiocese and their Catholic Charities enterprise.  As children, Plaintiffs were baptized and confirmed in the Roman Catholic faith and were taught to believe and to rely upon the religious doctrines of the Catholic Church for moral and spiritual guidance and to rely on Catholic priests and archbishops and bishops as role models and mentors who were the embodiment of God and who could do no wrong.  Given their families' Roman Catholic structure, Plaintiffs developed great trust, confidence, reverence, respect and obedience to the Roman Catholic Church and its Holy Fathers.  Plaintiffs attended Catholic church services regularly at Sacred Heart parish where JOHN DOE served as an altar boy and both Plaintiffs regularly received Holy Communion, administered by Father La Rosa-Lopez.  Plaintiffs continue to be Roman Catholic.

32.     As loyal Catholics and members of the Sacred Heart parish family and community, Plaintiffs and their parents trusted that the Roman Catholic Church, its servants and official representatives, its priests, archbishops and bishops, to include Defendant Archdiocese and its officials, Defendant Cardinal Daniel N. DiNardo, his predecessors and successors (Bishop Joseph Fiorenza) and other official representatives like Father La Rosa-Lopez, would always act as they held themselves out to be, namely: holy and chaste men with honor and integrity, acting in the best interest of the then-minor Plaintiffs, with confidence that they would never expose them or any other

14

children to any known danger, especially sexual predation.  Plaintiffs trusted and expected all Defendants herein would act in their behalf with the highest degree of trust, confidence, honesty, good faith and loyalty.

33.     Plaintiffs' parents required their participation in activities that followed the Roman Catholic structure, hoping that a positive male influence would develop through associating with Father La Rosa-Lopez as a role model, holy priest and spiritual advisor entrusted with the care of souls as a pastor at Sacred Heart.  When La Rosa-Lopez was assigned to the parish in 1996, the Diocese of Galveston-Houston placed him in charge of the Spanish-speaking masses including JOHN DOE's parents wherein he quickly ingratiated himself.  Beginning in 1998 and continuing until 2000, La Rosa-Lopez used his authority and position as assistant pastor to become a role model, mentor, confessor and counselor to JOHN DOE and other children.  La Rosa-Lopez was often a guest in JOHN DOE's home for dinners and other family events.  La Rosa-Lopez was even asked to be JOHN DOE's "compadre" or godparent.  Through these calculated means, La Rosa-Lopez gained access to JOHN DOE in order to groom JOHN DOE, then sexually abuse, sexually assault and sexually exploit him.  The molestation included, at first, inappropriate touching, talk and gestures but soon escalated into La Rosa-Lopez touching JOHN DOE's genitals with his hands, fingers and penis.  On at least one occasion, under the pretext of asking JOHN DOE to help move items from the parish office to the rectory, La Rosa-Lopez cornered JOHN DOE and prevented him from leaving the room and then assaulted JOHN DOE by fondling JOHN DOE's penis and touching JOHN DOE's anus.  La Rosa-Lopez also showed JOHN DOE pornographic photographs of partially naked men purportedly from La Rosa-Lopez's seminary school days.

34.     Father La Rosa-Lopez was also JANE DOE's confessor, counselor, role model, and

mentor.  In 2000 and 2001, using his role as assistant pastor and confessor, La Rosa-Lopez groomed

and manipulated the teenage girl into believing they were in a "romantic relationship" in order to

molest her.  The abuse included kissing, fondling her breasts and thighs and pressing his erect penis

against JANE DOE's genitals through her clothes.  On another occasion, La Rosa-Lopez cornered

JANE DOE in the Church kitchen, and while fondling her, reached under the girl's shirt and touched

her breasts.

35.     In 2001, JANE DOE's devout parents found out about the molestation and reported

it to the pastor of Sacred Heart, Monsignor David W. Kennedy (deceased).  Kennedy then reported

La Rosa-Lopez's abuse to Bishop Fiorenza. JANE DOE's family met with Fiorenza and Reverend

Frank Rossi, then-Chancellor of the Diocese (who was also accused of sexual misconduct of a

vulnerable female parishioner he was counseling), and a nun.  Of course, Bishop Fiorenza was aware

of La Rosa-Lopez's molestation at St. Thomas parish, but Fiorenza remained silent regarding this

fact and simply assured JANE DOE's devout parents that La Rosa-Lopez would be removed and

would get help.  Again, Fiorenza made no report to law enforcement nor did Fiorenza warn the

families at Sacred Heart or the general public about La Rosa-Lopez's predatory nature, and as before,

Fiorenza sent La Rosa-Lopez for further psychological evaluation and treatment at *The Shalom

Center* in Splendora, Texas in 2001 and 2002.  Although La Rosa-Lopez's  "rap-sheet" was well

known to the governing officials of the Diocese, the general public and the parishioners and parents

at La Rosa-Lopez's next assignment —a promotion by Fiorenza and the Archdiocese to pastor of

St. John Fisher Church ("St. John") in Richmond, Fort Bend County, Texas — were not told, but

kept in the dark about La Rosa-Lopez's prior sex crimes against children.  Based upon information

16

and belief, in 2005, while assigned at St. John's, Father La Rosa-Lopez raped a vulnerable adult female working at St. Theresa Catholic Church in Sugarland, Texas.  Despite the 2005 rape, in 2010 Defendant DiNardo appointed and installed Father La Rosa-Lopez as  the Archdiocesan Vicar for Hispanic Ministries.  In May 2018, just prior to his arrest on criminal charges arising from his sexual abuse of Plaintiffs, Father La Rosa-Lopez solicited another priest for sex acts in a hotel room and allegedly told the priest he "should be proud" of performing such favors on "an episcopal vicar." Although, the victim immediately reported the solicitation to the Archdiocese, the Archdiocesan officials, including Defendant DiNardo, did nothing to protect the vulnerable and they continued to cover up La Rosa-Lopez's long history of sexual misconduct with both children and adults.

36.      Plaintiffs would show the Court that the proximate cause of  La Rosa-Lopez's access to Plaintiffs was his education, training and certification for the Roman Catholic ministry at the Holy See's St. Mary's Seminary and Sacred Heart School of Theology, all sponsored and controlled by the Diocese and its duly appointed archbishop according to the Holy See's rules and norms for priestly training.  As a Catholic Priest ordained by the Holy See through the Diocese and its duly appointed Bishop Fiorenza, Father La Rosa-Lopez was then authorized to work and carry out the mission of the Roman Catholic Church in the Diocese and later Archdiocese of Galveston-Houston. In La Rosa-Lopez's position and assignment as a Roman Catholic diocesan priest and pastor with the Diocese and Archdiocese, La Rosa-Lopez was a vice-principal, employee, agent and servant of the Diocese, the Holy See and the Archdiocese.  Based on La Rosa-Lopez's status as an agent of the Diocese, the Holy See and the Archdiocese, La Rosa-Lopez's own knowledge of his own vile sexual propensities to rape, molest, abuse and exploit boys is imputed to the Diocese, the Holy See and the

17

Archdiocese.  Plaintiffs and their families dealt with these Defendants in good faith and believed Father La Rosa-Lopez was acting in the scope of his employment.

37.    Plaintiffs' sexual abuse and exploitation arose from the exercise of authority, power and access created by La Rosa-Lopez's job assignments and official duties as a Catholic priest under the supervision and control of the Diocese and its duly appointed bishop, who qualified, certified, authorized and assigned La Rosa-Lopez to work and serve as a spiritual counselor in the Diocese while La Rosa-Lopez was a seminarian and a "candidate to the priesthood."   Moreover, this sexual abuse and exploitation arose from the exercise of authority, power and access created by La Rosa-Lopez's job assignments and official duties as a Catholic priest and pastor with the Diocese and Archdiocese.  Defendants Archdiocese and DiNardo knew or should have known of La Rosa-Lopez's dangerous sexual propensities against vulnerable children, yet the Archdiocese and DiNardo did nothing to terminate La Rosa-Lopez's authority and power as a Roman Catholic priest or to remove La Rosa-Lopez from his position and job assignments with access to children or to control and supervise La Rosa-Lopez's access to the children he sexually abused as a result of his official duties and job assignments as a diocesan priest.  La Rosa-Lopez molested and sexually abused and exploited Plaintiffs as a result of La Rosa-Lopez's official duties and job assignments as a Catholic seminarian and cleric, priest and pastor.

38.    During the many occasions when Defendant Holy See and its agents, the Diocese and its duly appointed bishops, the Archdiocese and its duly appointed archbishops and DiNardo knew or should have known of La Rosa-Lopez's dangerous sexual propensities, Defendant Holy See, the Diocese and its duly appointed bishops, the Archdiocese and its duly appointed archbishops and DiNardo never reported the matter to law enforcement, as required by Texas' mandatory reporting

18

laws and under customary international laws of human rights.  Instead, in keeping with their institutional pattern and practice of covering-up, Holy See and the Diocese and Bishop Fiorenza qualified and certified, ordained and authorized La Rosa-Lopez to work and serve as a Catholic cleric and priest with the Diocese and later Archdiocese, where Archbishop Fiorenza and Defendant Cardinal DiNardo reassigned La Rosa-Lopez from parish to parish, allowing La Rosa-Lopez to continue to have unfettered access to children and vulnerable adults as a Diocesan Priest and pastor until his arrest by civil authorities in September 2018.

39.     Well before La Rosa-Lopez was ordained a priest in 1996, governing officials of the Catholic Church, including the Diocese and Bishop Fiorenza and Defendant Archdiocese, knew its Catholic clerics were sexually assaulting and otherwise sexually exploiting minors.  In accord with the Holy See's 1962 Instructions, the Diocese and its duly appointed Bishop Fiorenza ordered La Rosa-Lopez to a treatment center for "spiritual and psychological evaluation" when the Diocese received a report that La Rosa-Lopez had sexually abused a sixth-grade boy while La Rosa-Lopez was a seminarian, cleric and counselor assigned to St. Thomas Church.  In accord with the Holy See's 1962 Instructions, the Diocese and its duly appointed Bishop Fiorenza concealed La Rosa-Lopez's sexual abuse of the sixth-grader from Plaintiffs and the public and the authorities, while continuing to represent La Rosa-Lopez as a suitable "candidate to the priesthood," when in fact La Rosa-Lopez had been ordered to a treatment center for committing an outrageous, egregious crime against a child.  Moreover, in accord with the Holy See's 1962 Instructions, the Diocese and Bishop Fiorenza and Defendants Archdiocese and Cardinal DiNardo covered up the information about La Rosa-Lopez' sex crimes against Plaintiffs and other vulnerable persons in the Galveston-Houston Metropolitan District and failed to disclose the information to Plaintiffs and the public or the

19

authorities, while continuing to represent La Rosa-Lopez as a priest, "an episcopal vicar" with high moral character, when in fact La Rosa-Lopez had been "removed from ministry" and ordered twice to a treatment center for evaluation and treatment for predatory "sexual conduct." Furthermore, in accord with the Holy See's 1962 Instructions, the Archdiocese and its duly appointed archbishops, including Fiorenza and Defendant DiNardo concealed their knowledge about the injuries Plaintiffs and the other victims were suffering and failed to disclose this knowledge to Plaintiffs or the public or the authorities. The conduct of the Archdiocese and its duly appointed archbishops, including Defendant DiNardo, and the Diocese and Bishop Fiorenza, including failing to act on their knowledge of La Rosa-Lopez's crimes and Plaintiffs' injuries, was a substantial factor in causing Plaintiffs' damages as plead herein. At that time, Plaintiffs were minors. Timely public knowledge of La Rosa-Lopez's crimes would have revealed negligence and deceptive statements of the Holy See and its agents in the Galveston-Houston Metropolitan District, and the cover-up and the existence of Plaintiffs' claims against the Defendants. Instead, this information was fraudulently concealed and covered up by the Holy See and its agents, the Diocese and Bishop Fiorenza and Defendants Archdiocese and DiNardo, thereby allowing La Rosa-Lopez to be in a position of unchallenged authority around unsuspecting children including Plaintiffs and their parents.

40.     All Defendants held themselves out as counselors and instructors on matters that were spiritual, moral and ethical. By maintaining and encouraging such a relationship with Plaintiffs, all Defendants herein were in a confidential or fiduciary relationship with the Plaintiffs, grounded upon the duty of good faith and fair dealing and the duty to act with the highest degree of trust and confidence and loyalty. As a result of Plaintiffs' and their parents' confidence and trust in Defendants, Defendants gained superiority, power and influence over Plaintiffs. The fiduciary

relationship of confidence and trust imposes on the Defendants the duty and obligation to render full and fair disclosure to Plaintiffs of all facts that materially affect Plaintiffs' rights, safety and interests. This fiduciary relationship includes the duty to disclose and to act to protect Plaintiffs and other children from molestation, exploitation and sexual abuse by Catholic Priests and clerics, like La Rosa-Lopez, whom Defendants represented, not just to the Catholic community, but to the public, as being sexually safe, celibate, chaste and holy and otherwise sexually safe ("suitable") to be among children of either sex. Defendants, moreover, had a duty not to protect, harbor or conceal criminal conduct like La Rosa-Lopez's from law enforcement and Plaintiffs' parents, especially since La Rosa-Lopez was a foreseeable sexual risk to children and other vulnerable persons.

41.    Plaintiffs were unable to discover that Defendants breached any duty owed to Plaintiffs giving rise to these claims against Defendants. Plaintiffs were effectually prevented from availing themselves of their causes of action against Defendants due to Defendants' acts of fraud, misrepresentation, concealment, breach of fiduciary duty, and concert of action to conceal these criminal and negligent activities giving rise to a "civil conspiracy." Defendants had a unique knowledge of the facts giving rise to Plaintiffs' claims against them but fraudulently concealed and failed to disclose these facts to Plaintiffs. Plaintiffs thus pled delayed discovery of Defendants' fraud, fraud concealment, breach of fiduciary duty, continuing overt acts in furtherance of a civil conspiracy, and Plaintiffs' causes of action against these Defendants. Plaintiffs' ignorance of such facts was not willful, negligent or unreasonable.

42.    Defendants Holy See and the Archdiocese and its duly appointed archbishops, including Defendant Cardinal DiNardo, failed to properly report the illegal sexual abuse of children by La Rosa-Lopez as required by law prior to and 2010 and in 2018 and thereafter. Defendant Holy

See and the Diocese and Bishop Fiorenza failed to properly report the illegal sexual abuse of children by La Rosa-Lopez as required by law prior to 1996 and in 2001 and 2005 and thereafter. Specifically, Defendants had a duty under customary international laws of human rights, but failed to report scores of cases of "AGGRAVATED RAPE" under Tex. Penal Code §22.03 (since repealed), "SEXUAL ABUSE" under Tex. Penal Code §21.04 (since repealed), "AGGRAVATED SEXUAL ABUSE" under Tex. Penal Code §21.05 (since repealed), "SEXUAL ABUSE OF A CHILD" under Tex. Penal Code §21.10 (since repealed), "PUBLIC LEWDNESS" under Tex. Penal Code §21.07, "SEXUAL EXPLOITATION BY MENTAL HEALTH SERVICES PROVIDER" under Tex. Penal Code §21.14 (since deleted), "UNLAWFUL DISCLOSURE OR PROMOTION OF INTIMATE VISUAL MATERIAL" under Tex. Penal Code §21.16, "AGGRAVATED SEXUAL ASSAULT" under Tex. Penal Code §22.021, "INDECENT EXPOSURE" under Tex. Penal Code §21.08, "INDECENCY WITH A CHILD" under Tex. Penal Code §21.11, "CONTINUOUS SEXUAL ABUSE OF YOUNG CHILD OR CHILDREN" under Tex. Penal Code §21.02, "SEXUAL ASSAULT" under Tex. Penal Code §22.011, and "INJURY TO A CHILD" under Tex Penal Code §22.04. Defendants Holy See and the Archdiocese and its duly appointed archbishops, including Defendant Cardinal DiNardo and the Diocese and Bishop Fiorenza further failed to report the illegal sexual abuse of children by other Catholic priests and clerics as required by law in Texas in the 1980's and through the present time. It was not until January 2019, after the Montgomery County District Attorneys' Office issued a search warrant in November 2018 for the premises occupied by the Archdiocese, that the Archdiocese published the identities of clerics accused of rape, sexual assault, sexual abuse and sexual exploitation, where the identities had been kept secret for many decades.

43.     As a direct result of the sexual abuse and exploitation by La Rosa-Lopez and the acts and omissions and cover-up by all Defendants pleaded herein, Plaintiffs have suffered life-long, permanent injuries and damages, as more fully set forth below, from the time of their sexual abuse and continuing through the present time.

## IV.  CIVIL CONSPIRACY (PATTERN AND PRACTICE  OF COVER- UP OF CLERGY SEXUAL ABUSE OF CHILDREN)

44.     The problem of childhood sexual abuse committed by Roman Catholic clergymen was first acknowledged by the Holy See in 306 A.D. at the Council of Elvira in Spain when the council passed formal legislation condemning sexual abuse by the clergy, including sexual abuse of boys.  This early law continues in the current 1983 version of the Code of Canon Law which expressly forbids priests and clerics from having sexual relations or relationships with children.  The Code of Canon Law is mandatory and must be obeyed by all dioceses, archdioceses, religious orders, appointed bishops and archbishops, superior generals and priests and clerics.  Both old and current laws demonstrate that Defendant Holy See and all of its members, agents and employees, including The Archdiocese of Galveston-Houston and its duly appointed archbishops, to include current Archbishop Cardinal Dinardo, and his predecessor Bishop Fiorenza, are well aware of the practices of childhood sexual abuse by Roman Catholic priests and clerics while serving and during the course of the Holy See's ministry.

45.     Plaintiffs JANE DOE and JOHN DOE allege that Defendant Holy See has established exclusive policies and standards that dictate how sexual abuse of children by clergymen of the Holy See will be handled.  In 1922, the Holy See released a confidential document regarding cases of solicitation of sex, which mandated a specific procedure for the Holy See's agents to use when a

cleric or priest solicited sex from a child while in and during the course of the Holy See's ministry and the document required strict secrecy.  Under the Holy See's 1962 Instructions- an official legislative text issued by the Congregation of the Holy Office and specifically approved by Pope John XXIII-  penalties for the crime of solicitation include an order to move offending priests to other locations once they have been determined to be "delinquent."  Defendant Holy See created and maintained this policy of complete secrecy and transfers, even if that secrecy violated state, federal or international law, threatening all involved with excommunication and thus, damnation, if they do not comply.  According to the 1962 Instructions, once these non-discretionary penalties are levied, only the Holy See has the power to alter or remit the punishment.

46.     In 1963, a report from a Catholic religious order in the U.S.A. to Pope Paul VI (1963-1978) communicated that "problems that arise from abnormal, homosexual tendencies are going to call for, not only spiritual, but understanding psychiatric counseling."  This same report, which concluded that pedophiles were unrepentant, manipulative and dangerous and should be removed from the priesthood because they could not be cured, had been delivered to bishops and archbishops in the U.S. for the previous 10 years.  At this point in modern times, the Holy See and its agents and duly appointed employees knew it had a widespread problem of Catholic clergy molesting minors.

47.     In response to repeated warnings that Catholic pedophile clerics and priests were dangerous and should be removed from the ministry, the Holy See authorized and created facilities in the U.S.A. where "priests ... who have been addicted to abnormal practices, especially sins with the young...." would be sent for short periods rather than "given the alternative of a retired life within the protection of monastery walls or complete laicization."  Beginning in the 1960's, a large network of private Catholic owned and operated psychiatric treatment centers and hospitals was established

across the United States solely for the treatment of Catholic Clerics and Priests upon referral by their bishops and archbishops and superior generals. These treatment centers have treated Clerics and Priests exhibiting psychosexual disorders of pedophilia and ephebophilia. The treatment center operated by the Servants of the Paraclete, a Catholic religious order in New Mexico, was established in 1977 and was the first such treatment center in the world, secular or religious, to have an established residential healthcare program for the treatment of pedophilia and ephebophilia. This center evaluated and treated over 1,000 cleric and priest perpetrators, who the Catholic order referred to as "guests", from 1976-1995. The Shalom Center, founded in 1980, in Splendora, Texas was well-known among Texas bishops as another such residential treatment facility for evaluating and treating Catholic clerics and priests experiencing "a variety of issues" including sexual additions stemming from pedophilia and other inappropriate sexual behaviors. In 2001 and 2002, La Rosa-Lopez was a "guest" at the Shalom Center.

48.    Plaintiffs JANE DOE and JOHN DOE allege that at least by the mid 1960's, the Catholic superior generals, bishops and archbishops of the United States and Bishop Wendelin Nold of the Diocese of Galveston-Houston were well aware of the illegal sexual abuse of children by Catholic Clerics and Priests and of the state statutes requiring the reporting of sex crimes against children. These superior generals and bishops and archbishops and Bishop Nold were also aware that Catholic Clerics and Priests gained access to these children as the direct result of their status and responsibilities as Clerics and Priests who, as spiritual advisors and role models, exercised tremendous power over these children and their families. Archbishops Fiorenza and Cardinal DiNardo of the Archdiocese of Galveston-Houston were well aware of La Rosa-Lopez's sex crimes against children.

25

49.     By 1999, the government of Ireland began investigating the sexual abuse of minors by clergy.  Ireland's published conclusions include: the Catholic Church had a systemic problem of numerous clergy sexually abusing children; cases of sexual abuse were managed within the institution of the Church with a view to minimizing the risk of public disclosure and consequent damage to the institution; the offenses were not reported to the police because of a culture of silence about the issue; the recidivist nature of sexual abuse was well known to authorities within the institution; the Church authorities knew that the sexually abusing clergy were often long-term offenders who repeatedly abused children; when confronted with evidence of sexual abuse, a standard response of the religious authorities was to transfer the offender to another location https://assets.documentcloud.org/documents/243712/4-murphy-report-entire-ireland.pdf (last viewed February 4, 2020).

50.     In Catholic Dioceses and Archdioceses throughout the United States, to include The Diocese of Galveston-Houston and Archdiocese of Galveston-Houston, when cases of illegal rape and molestation and sexual abuse and exploitation of minors by Catholic Clerics and Priests have surfaced, these cases have been handled in such a uniform fashion as to demonstrate a common plan and scheme for concealing these crimes from the public, failing to report the crimes and thus avoiding criminal prosecution of cleric and priest perpetrators and the filing of civil claims by victims by covering the claims up.  This common plan and scheme was in existence before Plaintiffs JANE DOE and JOHN DOE were sexually abused and exploited and was followed to conceal the crimes against children by La Rosa-Lopez and other Clerics and Priests in the Holy See's ministry, including the Clerics and Priests in the Province of Texas and specifically, the Archdiocese of Galveston-Houston and The Diocese of Galveston-Houston and St. Mary's Seminary.  The members

26

of this common plan and scheme included Holy See and its official representatives and agents and the official representatives and agents of The Archdiocese of Galveston-Houston, its duly appointed archbishops, to include Archbishops Fiorenza, Cardinal Dinardo and La Rosa-Lopez, and others unknown to Plaintiffs.

51. The Defendants herein were aware of the harm to Plaintiffs and the wrongful conduct of La Rosa-Lopez at the beginning of the combination or agreement. These Defendants intended to accomplish the unlawful purpose of concealing sex abuse against children by La Rosa-Lopez and other Clerics and Priests and/or intended to conceal their breach of duty by the unlawful means of failing to report La Rosa-Lopez and other known perpetrators as required by Texas' mandatory reporting laws and the customary international laws of human rights. These Defendants knowingly caused further injury to Plaintiffs JANE DOE and JOHN DOE and other children as a result of failing to report sexual abuse and exploitation. This combination had the result of concealing sexual abuse of children by fraudulent and illegal means and concealing the facts giving rise to Plaintiffs' claims for civil damages against all Defendants. Acts in furtherance of this civil conspiracy were committed prior to August, 2018.

52. The elements of a "civil conspiracy" have therefore been met by the actions of the Holy See, the Archdiocese and Archbishops Fiorenza and Cardinal DiNardo as follows: (1) the combination consists of two or more persons; (2) the combination desires to either accomplish an unlawful purpose (concealing the rape and molestation and sexual abuse and exploitation of children by failing to report said abuse) and/or to accomplish a lawful purpose by unlawful means (concealing their breach of duty by failing to report said rape and molestation and sexual abuse and exploitation); (3) there is a meeting of the minds on the object or course of action; (4) there are numerous unlawful,

27

overt acts, i.e., i) the numerous separate instances of illegal sexual misconduct and ii) the failure to report the numerous separate instances of suspected child abuse and exploitation as required by Texas' mandatory reporting statutes and customary international laws of human rights; and (5) damages to the victim as the proximate result.

53.    All Defendants participated in coordinating the action, including the Holy See, the Archdiocese, Bishop Nold, and Archbishops Fiorenza and Cardinal DiNardo, which resulted in the use of fraud and misrepresentation. This series of events was carried out as part of the civil conspiracy pled herein to keep the rape, molestation, sexual abuse and exploitation of children a secret, and avoid the prosecution of cleric and priest perpetrators.  False representations were used to prevent the public from knowing of this high-profile case.  Efforts to conceal this combination are on-going and have included the unlawful failure to report La Rosa-Lopez to the proper authorities and the failure to confirm the identify other pedophile-priests until January 2019.

## V.  CLAIMS OF FRAUD, FRAUD BY NONDISCLOSURE AND CONCEALMENT

54.    Plaintiffs JANE DOE and JOHN DOE allege fraud against Defendant Holy See and its agents, Defendant Archdiocese and the Diocese and the Holy See employees duly appointed as archbishop of the Archdiocese, including Defendant Cardinal DiNardo, and as bishop of the Diocese and La Rosa-Lopez, in that (1) each Defendant made material representations and/or failed to disclose facts that they had a duty to disclose and/or voluntarily made partial disclosures that created a false impression of holy trust concerning a) La Rosa-Lopez's sexual proclivities, b) the safety of children in La Rosa-Lopez's care and c) the Catholic Church's responsibilities for providing La Rosa-Lopez with power and authority and access to vulnerable children and adults when Defendants absolutely knew La Rosa-Lopez was a dangerous predator; (2) their representations were false; (3)

each Defendant knew their statements were false when the Defendant made the statements or recklessly made the statements as a positive assertion without knowledge of the truth; (4) each Defendant intended that Plaintiffs rely on the Defendant's misrepresentations and/or partial disclosures and false impressions; (5) Plaintiffs JANE DOE and JOHN DOE relied on the misrepresentations and/or partial disclosures and false impressions; and (6) Plaintiffs JANE DOE and JOHN DOE suffered severe emotional injury.

55.     Plaintiffs JANE DOE and JOHN DOE claim that Defendant Holy See and its agents, Defendant Archdiocese and the Diocese, and the Holy See employees duly appointed as archbishop of the Archdiocese, including Defendant Cardinal DiNardo and as bishop of the Diocese, and La Rosa-Lopez, took actions designed to conceal the cause of Plaintiffs' injuries and each of these Defendants' breach of duty which gives rise to Plaintiffs' claims against these Defendants.  Plaintiffs allege that (1) each Defendant had actual knowledge of the facts concealed and (2) each Defendant had a fixed purpose to conceal the wrong.  Plaintiffs JANE DOE and JOHN DOE thus allege facts sufficient to establish concealment in that Plaintiffs have established (1) the existence of the underlying tort; (2) each Defendant's knowledge of the tort; (3) each Defendant's use of deception to conceal the tort; and (4) Plaintiffs' reasonable reliance on Defendants' deception.

## VI.  CAUSES OF ACTION AGAINST THE ARCHDIOCESE AND DINARDO

56.     Defendant Archdiocese of Galveston-Houston, to include its predecessor, the Diocese of Galveston-Houston and Defendant Cardinal Daniel N. Dinardo and his predecessor, Bishop Fiorenza negligently endorsed, selected, supervised and retained Reverend Manuel Antonio La Rosa-Lopez and assigned him to a position of trust, confidence, and authority at Sacred Heart Church, including as assistant pastor, and as a mentor, confessor and counselor in direct contact with

children. Defendants Archdiocese and Cardinal DiNardo knew or should have known La Rosa-Lopez was sexually dangerous to minors and grossly unsuited for such assignments. These Defendants negligently entrusted and exposed minors, including Plaintiffs and other minors, to La Rosa-Lopez's care, counseling, control and predation.

57.    Defendants were negligent in recruiting, endorsing, selecting, assigning, supervising and retaining La Rosa-Lopez and negligent in allowing him to minister and counsel youngsters when they knew or should have known of his perverse and predatory sexual nature.

58.    Defendants Archdiocese and Cardinal DiNardo negligently failed to provide reasonable monitoring and supervision of La Rosa-Lopez. Defendant DiNardo retained overall responsibility for all aspects of religious life in the Archdiocese, including the following duties: (a) to inquire and investigate La Rosa-Lopez before granting him permission to serve at Sacred Heart Church as assistant pastor in direct contact with children; (b) to supervise, evaluate, monitor, inspect and oversee all activities of La Rosa-Lopez; (c) to investigate, monitor and supervise La Rosa-Lopez as assistant pastor and as counselor in the Archdiocese of Galveston-Houston; and (d) to terminate La Rosa-Lopez's assignment upon repeated and documented notice that he was decidedly unsuited and dangerous for the positions he was assigned. Defendants Archdiocese and DiNardo were negligent in relation to each of these duties. Had they not been negligent, La Rosa-Lopez would never have had the means and opportunity to sexually abuse and exploit Plaintiffs and other children.

59.    Defendants Archdiocese and Cardinal DiNardo negligently failed to warn Plaintiffs, their parents, the parishioners at Sacred Heart Catholic Church in Conroe, Texas or the public that La Rosa-Lopez had the propensity to molest children of either sex, despite their knowledge and notice of these propensities.

60.     Prior to La Rosa-Lopez's sexual abuse of the Plaintiffs, Defendants negligently failed to investigate notices of sexual deviancies involving Father La Rosa-Lopez or to act on their knowledge that La Rosa-Lopez was unsuitable for a position affording access to minors and to respond by removing him from a position affording contact with children.

61.     Defendant Cardinal DiNardo and other Archdiocese officials failed to report to Child Protective Service or the Conroe Police Department that La Rosa-Lopez was a sexual predator, as required by Texas State law.

62.     Defendants Archdiocese and DiNardo negligently failed to implement reasonable policies and procedures that could detect and prevent the sexual abuse of minors by La Rosa-Lopez even though Defendants knew or should have known La Rosa-Lopez was a foreseeable risk for such sexual abuse and sexual misconduct.  The negligent acts arising out of Defendants' policies and practices include, but are not limited to:

a.  recruiting, endorsing, selecting, supervising, reassigning, and retaining clerics known to have abused minors, including La Rosa-Lopez;

b.  failing to inform parishioners and the public that such clerics assigned to their parishes were sexual threats;

c.  ignoring warnings from medical professionals even within the Catholic Church that certain clerics were potentially sexually dangerous to children;

d.  misrepresenting facts to victims who requested information about such clerics in order to fraudulently conceal the Archdiocese's own negligence in order to avoid scandal;

e.  failing to warn or alert parishioners/parents, previous parishes and the surrounding

31

communities where abusive priests had served that they were exposed to known or suspected child molesters;

 f. ignoring warnings from others within the Archdioceses and Bishops Conference who believed that such clerics were threats to children;

 g. failing to report the crimes committed by such clerics to the public or to law enforcement and obstructing or interfering with law enforcement's investigations concerning abusive priests;

 h. making decisions which reflected that the interests of abusive clerics and the desire to avoid scandal to the Church were vastly superior and more important than the interests of persons, particularly parishioners, who had been abused by such clerics;

 i. using Church influence and conspiring with others to alter the outcome of the criminal legal process relating to priests who had been engaging in illegal sexual acts in order to avoid liability and accountability to civil authorities and their victims and then to recycle them back into active ministry elsewhere;

 j. fostering an environment and culture where abuse of children could flourish and in which it was clearly understood that there was no accountability for criminal acts toward children;

 k. failing to employ priests who would not tolerate sexual misconduct and would act against it, or at the very least, failing to train priests on how to spot red flags and to intervene to prevent the sexual abuse of children;

 l. failing to prevent the sexual abuse, sexual assault and sexual exploitation by their employee, La Rosa-Lopez, and

 m. committing other acts of negligence and omission.

63.     Plaintiffs allege that Defendants Roman Catholic Archdiocese of Galveston-Houston and DiNardo are liable for the acts and/or omissions of Reverend Manuel Antonio La Rosa-Lopez under the legal doctrine of negligent assumption of the risk of intentional or criminal conduct. Defendants Archdiocese and DiNardo realized or should have realized that Reverend Manuel Antonio La-Rosa Lopez posed an unreasonable risk of harm to minors, including Plaintiffs. Plaintiffs thus plead Section 302B of the Restatement (Second) of Torts.

64.     At all relevant times, Defendants Archdiocese and DiNardo aided and abetted or were accessories before and after the fact in assisting La Rosa-Lopez in becoming a Catholic priest in the first place and later assigning him to Sacred Heart parish.  Therefore, Defendants Archdiocese and DiNardo have joint and several participatory liability for the actions of La Rosa-Lopez.

65.     At all relevant times, La Rosa-Lopez was an employee and/or agent of the Archdiocese acting in the course and scope of his employment or agency such that the Archdiocese is liable for the conduct of its employees and/or agents.  La Rosa-Lopez, engaged in assault, sexual assault and sexual exploitation of Plaintiffs as the Archdiocese's agent and/or vice-principal and was aided and abetted by Defendants Archdiocese and DiNardo before and after the fact, thus ratifying La Rosa-Lopez's conduct by failing to stop him.

66.     Plaintiffs also allege that Defendants Archdiocese and Dinardo failed to apprise Plaintiffs and their families and the local communities of La Rosa-Lopez's sexually deviant and predatory nature.  Thus, the Archdiocese's representation that La Rosa-Lopez was not sexually dangerous to youngsters placed Plaintiffs and other children at Sacred Heart parish and other parishes in peril. Plaintiffs plead that Defendants Archdiocese and DiNardo failed to exercise reasonable care and thus negligently misrepresented and negligently gave false information with the

intent to mislead, which proximately caused harm to the Plaintiffs, who reasonably relied upon the knowingly false representation that Father La Rosa-Lopez was suitable for a position involving access to minors.  Plaintiffs thus plead Section 311 of the Restatement (Second) of Torts and the legal doctrine of negligent misrepresentation involving the risk of physical harm.

67.   The sexual assault, sexual abuse and sexual exploitation of Plaintiffs and other children arose from La Rosa-Lopez's *imprimatur* of authority and power, and access to victims and their families created by his position and employment as a Catholic priest and counselor in good standing with Defendant Archdiocese.  Plaintiffs thus plead vicarious liability under the doctrine of *Respondeat Superior* in that Defendants Archdiocese and DiNardo knew or should have known of the dangerous propensities of La Rosa-Lopez and that his injurious sexual actions were foreseeable and thus preventable.  Because Defendants Archdiocese and DiNardo's authority over their priests exceeds the customary employer/employee relationship, Defendant Archdiocese is vicariously liable for all actions of La Rosa-Lopez as described above.

68.   The Archdiocese and Cardinal DiNardo's conduct at the time and on the occasions in question, and continuing through the present day, resulted in the intentional infliction of emotional distress upon Plaintiffs.

69.   Plaintiffs were invitees to the premises at Sacred Heart parish, including the church sanctuary and the rectory where La Rosa-Lopez's personal living quarters were located and the sexual abuse, assault and exploitation occurred.  The Sacred Heart premises were owned and/or operated by Defendants who owed a duty of care to those who might  be harmed by criminal acts on its premises when the risk of criminal conduct is so great that it is both unreasonable and foreseeable. Defendants were aware or should have been aware of criminal acts of assault by Father La Rosa-

34

Lopez against Plaintiffs on the Sacred Heart premises and at other locations.  Defendants breached their duty of care to Plaintiffs as invitees to the Sacred Heart premises.

70.     Defendants actively and constructively stated and/or represented numerous falsehoods, including purporting that La Rosa-Lopez was a man of good moral character, a holy man who could be entrusted with the care, counseling, teaching, and instruction of children.  These representations, among others outlined in this pleading, were false, untrue and misleading and were known to be false, untrue and misleading at the time they were made, or were made with a reckless disregard as to whether they were true or false or for their potential consequences to the laity of Galveston-Houston Archdiocese and in particular these Plaintiffs and their parents.  These falsehoods and non-disclosures were material facts made with the intent to deceive and to induce reliance.

71.     Plaintiffs allege that the Defendants Archdiocese and DiNardo and Reverend Manuel Antonio La-Rosa Lopez, were mental health services providers and counselors as set forth in TEX. CIV. PRAC. & REM. CODE § 81.001 *et seq.* and that La Rosa-Lopez engaged in the conduct prohibited under the Code.  Specifically, Father La Rosa-Lopez used his position as cleric, counselor and "confessor" to sexually abuse and exploit Plaintiffs.  The Archdiocese of Galveston-Houston and DiNardo are liable to Plaintiffs as employers.  Further, the Defendants Archdiocese of Galveston-Houston and DiNardo failed to report the exploitation and abuse pursuant to TEX. CIV. PRAC. & REM. CODE § 81.003, which constitutes *negligence per se.*  Defendants' conduct was and continues to be a proximate cause of Plaintiffs' injuries and damages for which they seek actual and exemplary damages and attorneys' fees as provided for under TEX. CIV. PRAC. & REM. CODE § 81.004.71.

72.     The actions of the Defendants Archdiocese and Cardinal DiNardo pled in paragraphs 56 - 71 proximately caused the incidents in question and the damages sustained by Plaintiffs.

### VII.  CAUSE OF ACTION AGAINST DEFENDANT HOLY SEE

73.     Defendant Holy See has specifically carved out the treatment of child sex abuse by clergy from other disciplinary matters to have continuing control over this issue, and governs it every day and perpetually according to the non-negotiable and mandatory standards.  Under Defendant Holy See's policy on sexual abuse of children, the Holy See mandates certain procedures and absolute secrecy by all involved under penalty of immediate removal from the organization (excommunication), retains the power at all times to conduct the inquisition of the case itself, and admits no deviations from its mandate.  Through its mandated policies and its agents and employees and instrumentalities, Holy See is an integral part of the day-to-day handling of cases of child sex abuse by clergy.  There is no discretion given to its agents and employees in the handling of such cases.

74.     Defendant Holy See has known that child sex abusers have a very high rate of recidivism and are likely to abuse more children.  As such, Holy See knew that children, parents and guardians who did not possess Holy See's knowledge about its clergymen and former clergymen and who unsuspectingly were around those clergymen and former clergymen were at a high risk to be sexually exploited and abused.  Moreover, because of the high rate of recidivism, Defendant Holy See's clergymen and former clergymen had probably already sexually exploited and abused numerous children. Defendant Holy See knew there were many victims out there who were hurt because of Defendant Holy See's policies of secrecy, concealment and self-protection.  Children are at risk because the public and law enforcement do not know the identity and the locations of these

clergymen and former clergymen of Defendant Holy See who have been accused of sexual misconduct.

75.     Upon information and belief, Defendant Holy See did not report all allegations of child sex abuse by its clergymen and former clergymen to law enforcement, or to those directly in the path of danger, or the public.  Further Defendant Holy See adopted a policy and practice where its agents and employees were not to report abuse by Holy See's clergymen to law enforcement, or to those directly in the path of danger, or the public.  Plaintiffs were harmed as a result of Defendant Holy See's practice and policy of not reporting suspected child abuse to law enforcement officials and requiring secrecy of all its agents and employees who received reports of abuse.

76.     At all times material hereto, Defendant Holy See directed its archbishops and bishops in the United States to conceal from its parishioners and the general public the sexual abuse of children committed by its priests and clerics and candidates to the priesthood.  To shield itself from "scandal" in the United States in 2002, Defendant Holy See denied approval of key provisions adopted by the U.S. Conference of Catholic Bishops that would have required Holy See's agents and archbishops and bishops in the United States to report all known or suspected child abuse to the civil authorities.  Defendant Holy See also refused to give U.S. archbishops and bishops the power to remove abusive priests and clerics from the ministry.  While the "public" policy of Defendant Holy See is to forbid childhood sexual abuse by priests and clerics within its control, the actual "private" or secret policy is to harbor and protect its abusive priests and clerics and candidates to the priesthood from public disclosure and prosecution.  Whether explicit or implicit, the transmission and receipt of these "public" and "private" or secret policies, directives and orders on childhood sexual abuse by the clergy are the actions of Defendant Holy See and its agents and employees that

occurred in the U.S.A. Plaintiffs were sexually abused and exploited as children by La Rosa-Lopez, one of Defendant Holy See's clerics and clergymen. Defendant Holy See's directives to conceal the sexual abuse of children committed by its clerics and clergymen to maximize revenue and image by avoiding scandal was a substantial factor in bringing about Plaintiffs' abuse. Plaintiffs thus plead vicarious liability under the doctrine of respondeat superior. At all times material herein, the Holy See's authority over its bishops and archbishops exceeds the customary employer/employee relationship, thus the Holy See is vicariously liable for all actions of its actual agents and employees, the duly appointed archbishops of the Archdiocese and the duly appointed bishops of the Diocese of Galveston-Houston.

77.    Defendant Holy See's policy of secrecy under penalty of excommunication for all involved in an accusation against the clergy or clerics for the crime of solicitation - which includes sexual abuse of a minor - insulated Father La Rosa-Lopez from consequences. Through this policy of secrecy, the Holy See knowingly allowed and permitted and encouraged child sex abuse by its clerics and priests, including Father La Rosa-Lopez.

78.    The practices, instructions, mandates and dictates of Defendant Holy See in the United States prohibiting the disclosure of the identity and existence of pedophiles and sexual predators among its clerics and priests and candidates to the priesthood under its control and placing children in a position of harm and peril, whether undertaken under the color of law or only in its capacity as a private actor, are a gross violation of established, universally recognized norms of international law of human rights.

79.    The worldwide acceptance of various international agreements, including the *Convention on the Rights of the Child*, demonstrates that some of their provisions have attained the

38

status of customary international law.   In 1990 Holy See signed the *Convention on the Rights of the Child,* which provides "in all actions concerning children ... the best interests of the child shall be a primary consideration," Art. 3; that the signatories "shall take all appropriate legislative, administrative, social and educational measures to protect the child from all forms of physical or mental violence, injury or abuse, ..., including sexual abuse," Art. 19; and that signatories "undertake to protect the child from all forms of sexual exploitation and sexual abuse," Art. 34.   These provisions in the *Convention on the Rights of the Child* and the provisions in the *Universal Declaration of Human Rights* signed by Holy See in 1948 codify longstanding legal human rights norms that reflect actual practices of states in prohibiting childhood sexual abuse and are not so novel as to be considered outside the bounds of what is customary, but are of universal concern. Violations of these customary international law of human rights and crimes which the law of nations attributes individual responsibility have been codified in these various international agreements, include but are not limited to:

a. the *Universal Declaration of Human Rights* in that Defendant Holy See, as a matter of policy, at all times practiced, ignored, tolerated, disregarded, permitted, allowed, condoned or failed to report childhood sexual abuse which the international community and the civilized world views as cruel, inhumane and degrading; and

b. the *Convention on the Rights of the Child*, in that Defendant Holy See, among other things, did not make the interests of minor children in its control its primary responsibility; did not conform to international standards for the safety and health of these children in considering the suitability and fitness of its priests and clerics and "candidates to the priesthood"; did not take all appropriate legislative, administrative, social and educational measures to protect these children from sexual

abuse; did not prevent, identify, report, investigate, treat or follow-up on instances of childhood sexual abuse of which it had knowledge; did not take all appropriate measures to ensure that school discipline was administered in a manner consistent with human dignity; and did not undertake to protect these children from sexual exploitation and abuse.

80.     Defendant Holy See, by and through its agents and employees, breached duties owed to Plaintiffs under the common law of the states, the federal common law, the laws of the fifty states, the laws of Texas and customary international law of human rights, including but not limited to:

a. The duty to provide safe care, custody and control of the minor children entrusted by their parents to the Roman Catholic churches and schools under the absolute control of Holy See.

b. The duty to warn parents, who entrusted their children's care, custody and control to the churches and schools of the Roman Catholic Church, that priests and other clerics were known pedophiles, sexual predators and perpetrators of childhood sexual abuse.

c. The duty to warn parents and children of a dangerous condition on Holy See's premises.

d. The duty to provide reasonable admission and certification guidelines for candidates for the priesthood to prevent sexual abuse.

e. The duty to not retain or certify seminarians for the priesthood that presented an unreasonable risk of harming others.

f. The duty to report known or suspected perpetrators of childhood sexual abuse to authorities as required by statutory law, common law, and customary international law.

81.     Defendant Holy See knew that its priests and clerics in the United States, and more specifically in the state of Texas, were committing acts of childhood sexual abuse and engaging in dangerous and exploitive conduct as pedophiles, sexual predators and perpetrators of childhood

sexual abuse, and that these priests and clerics created an unsafe condition on the premises of the churches and schools occupied and run by the Archdiocese and its duly appointed archbishops and the Diocese of Galveston-Houston and its duly appointed bishops, to whom the custody and control of minor children was placed.

82.     The acts and omissions of Defendant Holy See, including the concealment of its policy of harboring and protecting its abusive priests and clerics, and "candidates for the priesthood" from public disclosure and prosecution and directives prohibiting the reporting of child sexual abuse to authorities, as part of a regular course of commercial conduct and particular commercial transactions and acts, constitutes an act or acts of concealment or obstructive conduct under Texas and federal statutory law, common law and customary international law.

83.     A special legal relationship existed between Plaintiffs and Defendant Holy See, in the nature of a fiduciary relationship, which relationship was carried out by and through priests, clerics and administrators under the direct and absolute control of Defendant Holy See, in their capacity as paid educators and/or counselors and recruiters of minor children in the private schools of the Roman Catholic Church in the United States.  The Defendant breached fiduciary duties owed to Plaintiffs under the common law of the states, the federal common law, the laws of the fifty states, including Texas and customary international law of human rights, including but not limited to:

a. The duty to warn parents, who entrusted their children's care, custody and control to the churches and schools of the Roman Catholic Church, that its priests and clerics in those churches and schools were known pedophiles, sexual predators and perpetrators of childhood sexual abuse.

b. The duty to report known or suspected perpetrators of childhood sexual abuse to authorities as required by statutory law, common law, and customary international law.

c. A duty to provide a reasonably safe environment at its institutions.

d. A duty to mandate safe policies and procedures for its institutions.

84.     Holy See knew that La Rosa-Lopez had a history of sexually abusing and exploiting children and was a danger to children before La Rosa-Lopez abused and exploited Plaintiffs. Whether or not La Rosa-Lopez had a history of sexual abuse was a material fact to Plaintiffs and Plaintiffs relied on this non-disclosure.  Holy See intentionally did not disclose this fact to the then minor JANE DOE and JOHN DOE in order to induce them to act on the misrepresentation to their detriment.  Plaintiffs relied upon this intentional non-disclosure.

85.     Defendant Holy See, through its agents the Archdiocese and the Diocese of Galveston-Houston, represented to JANE DOE and JOHN DOE and their families that La Rosa-Lopez did not have a history of sexually abusing and exploiting children and that La Rosa-Lopez was not a danger to children.  Holy See owed a duty of care to JANE DOE and JOHN DOE because it knew or should have known that La Rosa-Lopez was a danger to children, and should have known that La Rosa-Lopez had molested children before he molested and abused JANE DOE and JOHN DOE, and should have known that parents and children would place the utmost trust in La Rosa-Lopez.  Holy See, through its agents the Archdiocese and the Diocese of Galveston-Houston, failed to use ordinary care in making the representations or in ascertaining the facts related to La Rosa-Lopez's significant/lengthy history of sexually abusing and exploiting children.  Holy See reasonably should have foreseen that its representations would subject JANE DOE and JOHN DOE to an unreasonable risk of harm.  JANE DOE and JOHN DOE believed and justifiably relied upon Holy See's representations.

86.     The actions of Defendant Holy See alleged herein in Paragraphs 73 - 85 proximately caused the incidents in question and the damages sustained by Plaintiffs JANE DOE and JOHN DOE.

### VIII.  CAUSES OF ACTION AGAINST DEFENDANTS HOLY SEE AND THE ARCHDIOCESE AND ARCHBISHOP CARDINAL DINARDO

87.     Plaintiffs allege that the Defendants herein have entered into a civil conspiracy to accomplish an unlawful purpose (namely, concealing the rape, molestation, sexual abuse and exploitation of children and the failure to report such abusive conduct to the authorities) and/or to accomplish a lawful purpose by unlawful means (namely, concealing their own negligence and breach of duty by the unlawful means of illegally failing to report such rape, molestation and abuse to the authorities).  This combination represents a meeting of the minds on the object or course of action to accomplish the above objectives and constitutes a civil conspiracy.  Numerous unlawful overt acts have been committed in furtherance of this combination; namely, the failure to report the numerous separate instances of sexual misconduct by La Rosa-Lopez in 1992, 1999, 2000, 2001, 2005, 2018 and thereafter as required by Texas' mandatory reporting statutes and customary international laws of human rights as well as the failure to report other predatory clerics and priests as required by federal and Texas' mandatory reporting statutes.  Numerous overt acts have been committed in furtherance of this civil conspiracy including overt acts prior to and after August, 2018. As a proximate result of this combination, Plaintiffs have suffered damages.

88.     Plaintiffs have also alleged that these Defendants, individually and collectively, have acted to conceal the cause of Plaintiffs' injuries, namely the Defendants' knowledge and negligence with regard to the rape, molestation, sexual abuse and exploitation of children by La Rosa-Lopez and others, as well as the negligence, fraud, and breach of fiduciary duty on the part of these Defendants

in concealing their knowledge and negligence. Each Defendant was knowledgeable of the existence of these claims. Each Defendant used deception to conceal these claims and their breach of duty or the breach of duty of previous duly appointed governing officials in permitting the rape, molestation and abuse to occur. Plaintiffs have reasonably relied on the Defendants' deception and Plaintiffs have been unable to discover that their claims against Defendants were concealed until after August 2018. Plaintiffs' ignorance of the facts concerning Defendants' knowledge and negligence was not willful, negligent or unreasonable.

89.    Plaintiffs allege several acts of fraud designed to conceal the wrongdoing and negligence of Defendants and the wrongdoing and negligence of previous duly appointed governing officials which occurred before and after the events giving rise to this litigation. Specifically, Plaintiffs plead deceptive acts prior to 1999, in 2001 and 2004 and from 2010 to the present. These deceptive acts had the purpose of concealing wrongdoing on the part of these Defendants until after August 2018.

90.    These Defendants have a fiduciary relationship with and a fiduciary duty to Plaintiffs. Specifically, as youth serving organizations, Defendants were under a duty to protect minors from harm, including sexual harm, when Plaintiffs were entrusted by their parents to the Catholic Church's care. This fiduciary relationship gives rise to the duty on the part of these Defendants to act with the highest degree of trust and confidence and loyalty towards Plaintiffs. Defendants breached their fiduciary duty to Plaintiffs. This breach of fiduciary duty includes the duty to warn and disclose.

91.    Defendants have been negligent in their actions and have violated their duty to exercise reasonable care to protect Plaintiffs from the foreseeable risk of child rape, molestation and

sexual abuse and exploitation by La Rosa-Lopez prior to 1999.

92.     Plaintiffs allege that the actions of these Defendants have been outrageous and have intentionally inflicted emotional distress upon Plaintiffs.

93.     Plaintiffs also allege that all Defendants acted in concert and are jointly and severally liable for all acts and/or omissions under the legal doctrines of conspiracy and concert of action as joint venturers, and as agents of these entities as these concepts are understood and provided for under Section 876 of the Restatement (Second) of Torts.  Thus, Plaintiffs seek damages from all Defendants, jointly and severally.

94.     The actions of Defendants alleged herein in  Paragraphs 87 - 93 proximately caused the incidents in question and the damages sustained by Plaintiffs.

## IX.  DAMAGES, GROSS NEGLIGENCE AND PUNITIVE DAMAGES

### A.  Plantiff JANE DOE

95.     As a result of the conduct and incidents described herein, Plaintiff JANE DOE has (a) incurred medical expenses for severe physical, emotional and psychological pain and suffering in the past and in all reasonable probability, will continue to incur medical expenses for severe physical, emotional and psychological pain and suffering in the future; (b) suffered mental anguish in the past and in all reasonable probability will sustain mental anguish in the future; (c) suffered physical impairment damages in the past and in all reasonable medical probability will suffer physical impairment damages in the future; and (d) suffered lost wages in the past and in all reasonably probability will suffer a diminished wage-earning capacity for the future.

96.     As a result of the above, JANE DOE seeks actual damages in the amount of $10,000,000.00.  Further, JANE DOE seeks attorney's fees as allowable under Tex. Civ. Prac. & Rem. Code § 81.001 *et seq.*

**B.**  **Plaintiff JOHN DOE**

97.     As a result of the conduct and incidents described herein, Plaintiff JOHN DOE has (a) incurred medical expenses for severe physical, emotional and psychological pain and suffering in the past and in all reasonable probability, will continue to incur medical expenses for severe physical, emotional and psychological pain and suffering in the future; (b) suffered mental anguish in the past and in all reasonable probability will sustain mental anguish in the future; (c) suffered physical impairment damages in the past and in all reasonable medical probability will suffer physical impairment damages in the future; and (d) suffered lost wages in the past and in all reasonably probability will suffer a diminished wage-earning capacity for the future.

98.     As a result of the above, JOHN DOE seeks actual damages in the amount of $10,000,000.00.  Further, JOHN DOE seeks attorney's fees as allowable under TEX. CIV. PRAC. & REM. CODE § 81.001 *et seq.*

**C.**  **Gross Negligence and Punitive Damages**

99.     Rape, especially of children, is considered heinous and utterly repugnant in civilized countries.  Rape cannot be tolerated in this country, particularly by institutions that are granted special exemptions for purported "religious" youth-serving organizations.  Yet, Defendants Holy See and the Archdiocese and the Holy See's duly appointed governing officials of the Diocese and later Archdiocese, including Defendant Cardinal DiNardo, knew that La Rosa-Lopez was a child molester but continued to recruit, promote and endorse La Rosa-Lopez as well as aiding and abetting him to become a priest and work as a priest in the Diocese and Archdiocese of Galveston-Houston.

Therefore, Defendants acted with heedless and reckless disregard for the safety of JANE DOE, JOHN DOE and other children and vulnerable adults. Plaintiffs therefore seek punitive and exemplary damages in order to punish and deter the outrageous and unconscionable conduct of the Defendants whose professed mission is the care and salvation of the souls of the faithful. Plaintiffs will prove by clear and convincing evidence that Defendants acted fraudulently and maliciously and were grossly negligent in that, either by act or omission, Defendants exposed Plaintiffs to an extreme degree of risk of harm, considering the probability, magnitude and extent of the harm that would likely impact Plaintiffs and which ultimately and consequently did. Further, Defendants had a real, subjective awareness of the risks involved, but nevertheless proceeded with callous indifference to violate the rights, safety, and welfare of Plaintiffs. These damages, in concert with La Rosa-Lopez's conduct —that constitutes felonies under Tex. Pen. Code §§ 21.11 (Indecency with a Child) and 22.011 (Sexual Assault) were committed knowingly by Defendants. Therefore, the punitive damage cap does not apply. *See* Tex. Civ. Prac. & Rem. Code § 41.008(c).

100.    To the extent that this case arises out of criminal conduct committed by La Rosa-Lopez, an unfit employee or and/or agent of the Defendants, Defendants are liable for exemplary damages because the agent was notably and notoriously unfit; Defendants acted with malice in recruiting, endorsing and sponsoring La Rosa-Lopez and/or in failing to supervise him; the employee, agent, and/or dual agent was employed in a managerial capacity and was acting in the scope of employment; and/or Defendants effectively aided and abetted and/or ratified or approved his acts.

101.    Tex. Civ. Prac. & Rem. Code § 1.005(a) does not apply to bar punitive damages in this matter because the Defendants were criminally complicit. Tex. Civ. Prac. & Rem. Code § 41.005(b)(2) provides an exception when a Defendant is criminally responsible as a party to the

criminal act.  Under Chapter 7 of the Texas Penal Code, specifically § 7.02(a), a person is criminally responsible for an offense committed by the conduct of another if:

> (1)    acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense; or
>
> (2)    having a legal duty to prevent the commission of the offense and acting with intent to promote or assist its commission, he fails to make a reasonable effort to prevent the commission of the offense.

Tex. Pen. Code Ann. § 7.02(a)(2). The provisions of this statute are met because Defendant Archdiocese aided and abetted La Rosa-Lopez in the commission of the sexual abuse and sexual assaults of Plaintiffs and others.

102.    Further, the statutory requirements under Tex. Pen. Code Ann. § 7.02(a)(3) are met because Defendants had a duty to prevent the sexual assaults of Plaintiffs and other minors and vulnerable persons but did not.  Defendants knew about La Rosa-Lopez's pattern and history of sexually abusing children, specifically about the sixth-grade boy's report but, despite that knowledge, never reported La Rosa-Lopez to the police or the public and subsequently even repeatedly endorsed La Rosa-Lopez, first as an ordained priest to be placed in environments where he could prey upon children like Plaintiffs with impunity.

103.    Additionally, Tex. Pen Code Ann. § 7.21-7.23 encompasses the criminal responsibility of corporations or associations and provides that a corporation or association is criminally responsible for the conduct of its agent if it was authorized, performed, or recklessly tolerated by a high managerial agent.  The hierarchy of the Holy See, its divisions and districts and duly appointed governing officials, not only tolerated La Rosa-Lopez's conduct, but aided and abetted La Rosa-Lopez in acquiring more victims.  Plaintiffs would show that Defendants recklessly tolerated and allowed the conduct of La Rosa-Lopez and are therefore subject to punitive damages.

## X.   CLAIMS FOR PRE-JUDGMENT AND POST-JUDGEMENT INTEREST

104.     Plaintiffs claim pre-judgement and post judgment interest in accordance with 28 U.S.C. § 1961 and any other applicable law.

## XI.   STATEMENTS TO THE COURT

105.     Plaintiffs allege that the actions of all Defendants, because of their conduct, statements and promises, preclude them from claiming the bar of limitations to any of Plaintiffs' claims.  Plaintiffs thus plead the doctrine of Equitable Estoppel.

106.     Plaintiffs allege that these Defendants have acted in concert in keeping with its corporate pattern and practice of fraudulently concealing their predatory clerics by recycling them, concealing the extent and nature of cleric sexual abuse and concealing the harmful effects of such abuse.

107.     Plaintiffs plead fraud and fraudulent concealment of this fraud on the part of Defendants, thus suspending the running of limitations as to all claims.

108.     Plaintiffs have plead fraudulent concealment of facts under Defendants' control giving rise to Plaintiffs' causes of action against all Defendants, thus suspending the running of limitations.

109.     Plaintiffs have plead fraudulent concealment of fraudulent statements and other fraudulent misrepresentations known to Defendants concealing Plaintiffs' claims, thus suspending the running of limitations.

110.     Plaintiffs have plead breach of fiduciary duty, including the duty to disclose and the use of deception to conceal Plaintiffs' cases against all Defendants for breach of the duty of care, thus suspending the running of limitations against all Defendants.

111.    Plaintiffs have plead a civil conspiracy to conceal criminal acts, to conceal the commission of criminal acts, to conceal negligence by unlawful means, to conceal fraud, to conceal the breach of the duty of trust and confidence, and to conceal the use of deception to avoid claims until limitations expire by illegal means, thus suspending the running of limitations against all Defendants as to all claims.

112.    Plaintiffs have plead that they were unable to discover this fraud, fraudulent concealment, or the civil conspiracy despite reasonable diligence on their part until within two (2) years of the filing of this case.

113.    Plaintiffs plead that the Discovery Rule applies in this case due to the insidious nature of the crime of sexual abuse of children, which renders victims' claims inherently undiscoverable, thus tolling the statute of limitations.  Further, Plaintiffs' claims are objectively verifiable by the sexual abuse of at least four other victims who suffered sexual injury at the hands of La Rosa-Lopez.

114.    Plaintiffs pled that the statute of limitations has not run under Texas Civil Practice and Remedies Code 16.0045 et. seq.

115.    Plaintiffs pled that the statute of limitations has not run under Chapter 81 of the Texas Civil Practice and Remedies Code.

116.    Plaintiffs plead continuing tort where Defendants' continuing torts of negligently, intentionally and fraudulently concealing information about the sexual abuse crisis in general and specifically as to La Rosa-Lopez, as well as the continuing tort of covering up their clerics crimes against children, has never ceased.  Indeed, as recent as law enforcement issuing and executing search warrants for the Holy See's premises occupied by the Archdiocese and *The Shalom Center*, it is apparent the pattern of cover-up continues to the present day.

117.    Plaintiffs' invoke the open-courts provision of the Texas Constitution, Article 1 § 13.

118.    Plaintiffs assert that all Defendants are jointly and severally liable for their negligent misrepresentations involving risk of physical harm under the legal doctrine of concert of action, as joint venturers, and as agents of these entities pursuant to Section 876 of the Restatement (Second) of Torts.

FOR THE REASONS STATED ABOVE, Plaintiffs JANE DOE and JOHN DOE pray that all Defendants named herein be served and cited to appear and answer herein and that upon final judgment of this cause, Plaintiffs have judgment against Defendants, jointly and severally, for a sum of money for damages described herein, for attorneys' fees, for cost of suit, for interest from the date of the incidents and for such other relief to which Plaintiffs may be justly entitled.

RESPECTFULLY SUBMITTED,

SMITH PEAVY, L.L.C.

By: /S/ Felecia Y. Peavy_____
    Felecia Y. Peavy, Attorney-in-Charge
    Federal ID No. 13530
    Texas Bar No. 15698820
    P.O. Box 3464
    Houston, Texas 77253
    (713) 222-0205
    felepeavy@juno.com

TAHIRA KHAN MERRITT, P.L.L.C.

By: /S/ Tahira Khan Merritt_____
    Tahira Khan Merritt
    Federal ID No. 17525
    Texas Bar No. 11375550
    8499 Greenville Ave., Suite 206
    Dallas, Texas 75231
    (214)503-7300
    (214)503-7301(FAX)
    tahira@tkmlawfirm.com

ATTORNEYS FOR PLAINTIFFS